The STATE of Ohio, Appellee,

v.

CHADWELL, Appellant.

[Cite as State v. Chadwell, 182 Ohio App.3d 256, 2009-Ohio-1630.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22698.

Decided April 3, 2009.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Melissa M. Ford, Assistant Prosecuting Attorney, for appellee.

Thomas R. Schiff, for appellant.

FROELICH, Judge.

{¶ 1} Claude W. Chadwell pleaded no contest to possession of crack cocaine and possession of heroin, both fifth-degree felonies, after the Montgomery County Court of Common Pleas overruled his motion to suppress. The trial court found him guilty and sentenced him to five years of community control.

{¶ 2} Chadwell appeals from the denial of his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

I

{¶ 3} The state's evidence at the suppression hearing established the following facts.

{¶ 4} At approximately 6:00 p.m. on August 1, 2007, Dayton police detective David House, an experienced detective in the city's drug unit, received a cell phone call from detective Craig Polston of the Greene County Ace Drug Task Force. Polston advised House that he and other members of his unit were in the 100 block of South Torrence Street in Dayton, conducting a follow-up investigation to a drug investigation in Greene County. Polston indicated that his unit was looking for an individual, later identified as David Messer, whom they had observed making what they believed to be several hand-to-hand drug transactions. Polston indicated that Messer had been seen going in and out of 134 South Torrence Street, and he provided a description of Messer to House.

{¶ 5} After talking with Polston, House drove in his unmarked police vehicle to the 100 block of South Torrence Street. This address is in a residential area known for high drug activity. Numerous "buy busts" and other drug arrests have occurred in this area. House indicated that individuals frequently come to the area and arrange their drug transactions through pay phones in the businesses in that location or by using their cell phones.

{¶ 6} House looked up and down the street and drove around the block, looking for Messer. When House did not see anyone matching Messer's description, he parked his vehicle on South Torrence Street. Within a couple of minutes, House observed a vehicle turn off East Fourth Street onto South Torrence Street and pull directly in front of 134 South Torrence Street. An individual matching Messer's description got out of the back seat and went into the residence. The vehicle immediately drove away. Chadwell was not involved with this vehicle.

{¶ 7} After a few minutes, House saw Messer exit 134 South Torrence and walk to another residence at the southwest corner of South Torrence and Fourth Streets. Messer knocked on the door, entered, stayed for a few minutes, and

then returned to 134 South Torrence Street. House continued to observe the residence from his vehicle.

{¶ 8} Several minutes later, Messer left the residence. He walked toward Fourth Street, talking on his cell phone, and he turned west down an alley that runs parallel to Fifth Street. House attempted to follow Messer in his vehicle. When Messer crossed South Garfield Street, he looked in House's direction but kept walking. House drove north on South Garfield Street, passing Messer. When House tried to locate Messer again, he was unsuccessful. After circling the area several times, House met with Polston and other members of the Greene County unit and assisted them on an unrelated matter.

{¶ 9} After completing the unrelated matter, Polston told House that he was interested in returning to South Torrence Street—the 200 block, this time—to try to locate a vehicle that was part of their drug investigation. At approximately 7:20 p.m., House drove to South Torrence and Fifth Streets, where he observed Chadwell seated in the driver's seat of a green Ford Explorer that was parked next to a business on South Torrence, just south of Fifth Street, facing north. Chadwell was talking on his cell phone.

{¶ 10} After approximately two minutes, Chadwell pulled up to the stop sign at South Torrence and East Fifth Streets. As he stopped, House saw a marked cruiser coming toward the intersection where Chadwell had stopped. Chadwell put his vehicle in reverse, drove backward on South Torrence Street to Bierce Avenue, and turned onto Bierce Avenue "in what appeared to [House] to be an obvious attempt to avoid the marked police cruiser." House attempted to follow Chadwell, but he was unable to locate him. House drove back to South Torrence Street.

{¶ 11} When House turned onto South Torrence Street from East Third Street, he saw Messer ahead of him, walking on the sidewalk. Messer raised his left hand as if he were directing someone where to park. House looked farther down the street, and he saw Chadwell driving the Explorer. Chadwell pulled to the curb and parked in the spot that Messer had indicated, just to the south of Fourth Street on South Torrence. Messer continued to walk down the street toward Chadwell's vehicle, and House observed him cross the street toward the passenger side of the vehicle. House believed that a narcotics transaction was about to take place between Messer and Chadwell.

{¶ 12} House pulled his car forward into the intersection and got out of the vehicle. He was wearing a Dayton Police tactical vest that identified him as a police officer, his badge was affixed to the left breast area, and he was wearing his holster. Messer watched House step out of the vehicle, and he immediately ran south on South Torrence Street, past Chadwell's vehicle. House pursued

Messer on foot and quickly apprehended him. Chadwell, meanwhile, pulled away from the curb and sped off east on Fourth Street.

{¶ 13} After Messer was secured, House got on his police radio and advised that the Explorer had left. House asked other officers to stop the vehicle. Dayton police detective Rodney Barrett, traveling in an unmarked vehicle, located and followed Chadwell. Detectives Douglas Hall and Shawn Copley, driving in a marked cruiser, caught up with them and observed that Chadwell "was probably exceeding the speed limit." Barrett let Hall and Copley pass him, and the detectives stopped Chadwell's vehicle.

{¶ 14} After the vehicle was stopped, Hall saw that Chadwell had "raised up in his seat and he appeared to be placing both hands in front of him around his waist area," apparently trying to hide or retrieve something. Hall approached Chadwell and asked whether he had a valid driver's license. Chadwell admitted that he did not. Chadwell was placed under arrest, and a subsequent search of the vehicle uncovered a quantity of drugs.

{¶ 15} In September 2007, Chadwell was indicted for possession of cocaine in an amount less than five grams, possession of heroin in an amount less than one gram, and possession of crack cocaine in an amount less than one gram. He moved to suppress the evidence, claiming that the evidence was seized as a result of an unlawful traffic stop.

{¶ 16} After a hearing, the trial court overruled the motion. The trial court concluded that the detectives had a reasonable and articulable suspicion of criminal activity based on House's observations of Messer, Chadwell's fleeing the scene, and Chadwell's exceeding the speed limit. The court further determined that Chadwell's actions after he was stopped created a reasonable suspicion that he was armed and perhaps trying to retrieve a weapon. The trial court thus found that the detectives were entitled to conduct a limited search of Chadwell and the lunge area of the vehicle, which led to the discovery of the drugs.

{¶ 17} Chadwell subsequently pleaded no contest to, and was found guilty of, possession of crack cocaine and possession of heroin. In return, the state dismissed the possession-of-cocaine charge. Chadwell was sentenced accordingly.

{¶ 18} Chadwell appeals from the denial of his motion to suppress, raising one assignment of error.

## II

{¶ 19} On appeal, Chadwell claims that "[t]he police had no reasonable or articulable basis in which to legally justify an investigatory stop of Mr. Chadwell's vehicle." He argues that his mere proximity to criminal activity in a high-crime area was insufficient to justify an investigatory stop. He asserts that he

"exhibited no behavior that warranted a reasonable suspicion of criminal activity" and that this case is analogous to *State v. Davis* (2000), 140 Ohio App.3d 659, 748 N.E.2d 1160, in which the Ninth District Court of Appeals held that police officers lacked a reasonable and articulable suspicion that the defendant was engaged in criminal activity when the defendant was stopped solely because he had exited an apartment under surveillance. As discussed below, we find Chadwell's argument to be without merit.

{¶ 20} In reviewing the trial court's ruling on a motion to suppress evidence, this court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. See *State v. Morgan* (Jan. 18, 2002), Montgomery App. No. 18985, 2002 WL 63196. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." Id.

{¶ 21} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry,* police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable and articulable suspicion that the person is engaged in criminal activity. *State v. Martin,* Montgomery App. No. 20270, 2004-Ohio-2738, 2004 WL 1178737, ¶ 10, citing *Terry*; *State v. Molette,* Montgomery App. No. 19694, 2003-Ohio-5965, 2003 WL 22533030, ¶ 10. This is so even if the officers lack probable cause to make an arrest. Id. "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556–557, 591 N.E.2d 810, citing *Terry,* 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 22} We determine the existence of "reasonable and articulable suspicion" by evaluating the totality of the circumstances, considering those circumstances " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Heard,* Montgomery App. No. 19323, 2003-Ohio-1047, 2003 WL 860692, ¶ 14, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271. An investigatory detention occurs when, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or was compelled to respond to questions. *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497; *Terry,* 392 U.S. at 16, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889.

■■ {¶ 23} In the present case, Chadwell was stopped by Detectives Hall and Copley, who were responding to a radio dispatch from Detective House to stop Chadwell's vehicle. When, as in this case, the police officers making the investigative stop rely solely upon a dispatch, "the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." *Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 720 N.E.2d 507, at paragraph one of the syllabus. The officers making the investigatory stop—in this case, Detectives Hall and Copley—need not be aware of the facts that led their fellow officer, Detective House, to make the dispatch. See id. at 297, 720 N.E.2d 507.

■ {¶ 24} Upon review of the record, we conclude that Detective House had a reasonable and articulable suspicion that Chadwell was involved in criminal activity to warrant an investigatory stop and that, unlike in *Davis*, House's suspicion was not based solely on his proximity to Messer, who was under surveillance. While Chadwell was being watched by House, he was located in a high-crime area in which drug activity had often occurred. Chadwell was observed sitting in a vehicle in front of a business and talking on his cell phone, which was behavior that House associated with drug activity. Chadwell repeatedly returned to South Torrence in his vehicle and stopped along the street, but he was not observed entering a residence. Chadwell was later seen pulling into a parking space as directed by Messer, another individual who was under surveillance for drug activity, and Messer began to approach Chadwell's vehicle. This behavior led Detective House to believe that a drug transaction was about to occur.

{¶ 25} Moreover, when Chadwell had previously seen a marked police cruiser approaching the intersection where he had stopped at a stop sign, Chadwell put the vehicle in reverse, drove backward down the street, and turned down another street away from the cruiser. From this behavior, it was obvious to House that Chadwell was attempting to avoid the cruiser. Later, when Detective House exited his vehicle in order to approach Chadwell and Messer, Chadwell pulled away from the curb and sped away, again fleeing from the police. Thus, before issuing the dispatch, House had twice seen Chadwell at least attempt to avoid police officers.

■ {¶ 26} "Unprovoked flight upon seeing police officers is a relevant consideration in determining whether the totality of the facts and circumstances are sufficiently suspicious to justify a *Terry* stop. *Illinois v. Wardlow* (2000), 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570. While such [behavior] is not necessarily indicative of criminal behavior, and can be consistent with innocent conduct, *Terry* recognized that officers may briefly detain individuals to resolve ambiguity

in their conduct. Id." *State v. Jordan*, Clark App. No. 05CA04, 2006-Ohio-1813, 2006 WL 925187, ¶ 22.

{¶ 27} Viewing the totality of the circumstances, House had a reasonable and articulable suspicion that Chadwell was engaged in criminal activity based on Chadwell's presence in an area known for drug activity, the location and manner in which he spoke on his cell phone and drove around the area, his contact with another individual suspected of drug activity, and his two obvious attempts to flee from the police. Because Detective House had a sufficient basis to justify an investigatory stop under *Terry*, Detectives Copley and Hall acted lawfully when they pulled over Chadwell's vehicle based on House's dispatch, requesting that Chadwell's vehicle be stopped.

{¶ 28} After the detectives stopped Chadwell's vehicle, Chadwell admitted that he did not have a valid driver's license. At that point, Chadwell was placed under arrest and his vehicle was subsequently searched, leading to the seizure of the drugs. "[W]hen a police officer makes a lawful custodial arrest of an occupant of an automobile, he may, as a search incident to that arrest, search the passenger compartment of the automobile." *State v. Bowshier*, Clark App. No. 2005–CA–27, 2006-Ohio-4929, 2006 WL 2709705, ¶ 52, citing *State v. Murrell* (2002), 94 Ohio St.3d 489, 764 N.E.2d 986, and *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. Because the search of Chadwell's vehicle occurred immediately after his arrest for driving without a valid license, the police were entitled to search the vehicle—and to seize any contraband found—as a search incident to Chadwell's arrest.

{¶ 29} In summary, because Detective House had a reasonable, articulable suspicion that Chadwell was engaged in criminal activity, the detectives acting on House's dispatch lawfully initiated an investigatory stop under *Terry*. Once Chadwell was under lawful arrest, the officers were entitled to immediately search his vehicle as a search incident to his arrest. The resulting seizure of drugs from Chadwell's vehicle was thus lawful. Accordingly, the trial court properly denied Chadwell's motion to suppress.

{¶ 30} Chadwell's assignment of error is overruled.

### III

{¶ 31} Having overruled the assignment of error, we will affirm the judgment of the trial court.

Judgment affirmed.

Donovan, P.J., and Wolff, J., concur.

WILLIAM H. WOLFF JR., J., retired, of the Second District Court of Appeals, sitting by assignment.