[Cite as *State v. Twinam*, 2013-Ohio-720.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee              :              C.A. CASE NO.    25153

v.                                     :              T.C. NO.    11CRB7223

COLBY TWINAM                           :              (Criminal appeal from
                                                        Municipal Court)

    Defendant-Appellant          :

                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    1st    day of    March   , 2013.

. . . . . . . . . .

TROY B. DANIELS, Atty. Reg. No. 0084957 and AMY B. MUSTO, Atty. Reg. No. 0071514, Assistant City Prosecutors, 335 W. Third Street, Room 372, Dayton, Ohio 45402
    Attorneys for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 131 N. Ludlow Street, Suite 630, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     This matter is before the Court on the Notice of Appeal of Colby Twinam, filed  April 4, 2012.  On December 30, 2011, Twinam  was found guilty, following a

bench trial in Dayton Municipal Court, of carrying a concealed weapon, namely brass knuckles, in violation of R.C. 2923.12(A)(1), a misdemeanor of the first degree. He was sentenced on March 19, 2012, to 180 days in the Montgomery County Jail, with credit for two days served, and the court suspended 178 days of his sentence. The court ordered that the brass knuckles be destroyed and fined Twinam $150.00. We hereby affirm the judgment of the trial court.

{¶ 2} Twinam was charged with the instant offense by way of complaint on July 12, 2011, and on July 25, 2011, he filed a motion to suppress. Following a hearing, the trial court overruled the motion to suppress on October 21, 2011.

{¶ 3} At the suppression hearing, Officer Mark Orick, of the Dayton Police Department, testified that on July 11, 2011, while on routine patrol with his partner, Officer Robert Clingner, he observed Twinam's vehicle parked in the driveway of a vacant house on Nicholas Road. Orick also observed Askayi Robinson, whom Orick had twice previously arrested for felony drug possession and also pursued twice on foot, standing at the window of Twinam's car, with his hand inside the window. Orick testified that his observations were "indicative of being a hand-to-hand drug transaction. I have had numerous arrests in that area and I've also had one additional arrest of another person who was pulled into that exact same vacant house, driveway where they were arrested for a hand-to-hand drug transaction." The other arrest in the same driveway occurred three weeks prior to July 11, 2011, according to Orick. Orick stated in total that he has "had over five hundred to probably seven hundred arrests or drug related arrests in my short three years with the City of Dayton."

{¶ 4}   Orick stated that Twinam's vehicle had "very dark tinted windows." He testified that upon observing Robinson, he began to turn his cruiser around, at which time Robinson, having observed Orick, "immediately" removed his hand from the vehicle and fled "through vacant yards" in a "dead sprint." Orick stated that Twinam put his car in reverse as Orick pulled into the driveway and parked his cruiser directly behind Twinam, "half in the driveway and partially in the street." Orick testified that he and Clingner exited their cruiser, with their weapons "at a low ready," and began to approach Twinam's car while Orick repeatedly ordered Twinam to place the vehicle in park. When the rear backing lights remained illuminated, Orick testified that he was concerned that Twinam intended to either back the vehicle into the officers or their cruiser. Orick stated that he again "commanded the driver with a very loud voice to place the vehicle in park, which he still refused to do at that point."

{¶ 5}   Orick stated that he observed that Twinam's window was open "maybe six to eight inches," and he ordered him numerous times to roll the window all the way down and show his hands. When Twinam refused, Orick stated that he was concerned that Twinam had a weapon. Orick stated that he observed that Twinam was alone in the vehicle. Orick testified that after Twinam refused to comply with his orders, he raised his weapon and pointed it at the window and "again with a very loud commanding voice" ordered Twinam to place the vehicle in park. After Twinam did so, Orick stated that he holstered his weapon, as Clingner provided cover. Orick stated that in the course of placing his weapon in the holster, he observed Twinam lean down to his right and then lean completely forward, and Orick stated that he feared he "may be reaching for some type of weapon." Orick stated that he opened the door of the vehicle and removed Twinam, placing him on the ground.

{¶ 6} After Twinam was removed from the car, while Clingner conducted a pat down search of him, Orick stated that he observed "in plain sight on the front driver's side floor board * * * two empty gel caps, which are commonly sold at any drug store, which are normally used to transport narcotics." Orick also observed "directly on his front seat * * * a cloth pouch, * * * and then right there in plain view was a pair of brass knuckles." After Twinam was placed in the cruiser, Orick testified that he advised him that he was under arrest for carrying a concealed weapon, and he read Twinam his *Miranda* rights from a card. Orick stated that Twinam indicated his understanding of his rights, and he agreed to speak with Orick. According to Orick, Twinam "was somewhat stunned that he was being arrested for carrying a concealed weapon. He stated that he was not aware that * * * brass knuckles were considered a weapon and he admitted that he had purchased them * * * at a flea market."

{¶ 7} On cross-examination, Orick stated that he observed Robinson, as he turned to run, place what Orick believed to be U.S. currency in his pants pocket. Orick stated that it was daylight at the time. According to Orick, his "run-ins with Askayi Robinson have all been purely drug related or fleeing from the police." Orick testified that there is no video of the instant encounter. The following exchange occurred:

Q. Okay, but when you were coming down the street you did not seeing (sic) anything exchange hands?

A. All I saw was his hands inside the Defendant's vehicle.

Q. So you were not able to observe Mr. Twinam grabbing anything from Askayi?

A. No, not while I was making my turn, no, to make contact.

Q. You did not see Askayi pass anything off in the vehicle?

A. No, I did not.

{¶ 8}  Orick stated that Twinam was placed in handcuffs upon his removal from the vehicle.  Orick stated that Clingner performed the pat down and then escorted Twinam to the cruiser.  Orick stated that the pouch containing the brass knuckles was "affixed" to the front of the driver's seat, and that there was no "flap or anything covering the pouch."  Orick stated that there was not enough residue in the gel caps to test them, and he stated that they were "squished."  Orick stated that as he initially approached the vehicle, he was unable to discern "features" but only Twinam's silhouette due to the heavy tint on the windows. Orick stated, in response to questions from the court, that the "mesh type of pouch" was "affixed to the very front of the seat," and that he observed it while Clingner patted Twinam down.  Orick stated that he could "see the brass knuckles through the pouch because * * * it was mesh, it wasn't like a piece of cloth with a flap over it, it was like a piece of mesh."  When asked by the court if it was immediately clear to him that the pouch contained brass knuckles, Orick responded, "[a]bsolutely yes, I've seen numerous pairs of brass knuckles."

{¶ 9}  In overruling Twinam's motion to suppress, the court determined in part as follows:

> * * * Officer Orick did not observe any movements that would appear to be part of a hand-to-hand drug transaction.  The known drug dealer's hands were in the car window and the Officer could not see what was going on inside the car. In this Court's opinion, hands being inside a car window, with nothing more, is not the type of activity the Second District Appellate Court relied on in [*State v.*

*Johnson*, 2d Dist. Montgomery No. 19203, 2002-Ohio-4684[1] and *State v. Abrams AKA Stone*, 2d Dist. Montgomery No. 14050, 1994 WL 171330[2] ]. However, Officer Orick's observations couple[d] with his experience with drug arrests at this same location three weeks earlier; his prior arrests and chases with the known drug dealer; the area's reputation for drug activity; being parked in the driveway of a vacant house; and the Defendant's attempt to leave are all factors that establish reasonable articulable suspicion. An area's reputation for criminal activity is an articulable fact which is part of the totality of circumstances surrounding a stop to investigate suspicious behavior. * * * Unprovoked flight upon seeing a police officer is a relevant consideration in determining reasonable articulable suspicion. * * *

Based on the totality of the circumstances, Officer Orick had the reasonable and articulable suspicion to effectuate a *Terry* stop of the Defendant to investigate the possibility of criminal activity. * * *

{¶ 10} At trial, Orick provided testimony that was consistent with his testimony at the suppression hearing regarding the sequence of events that resulted in Twinam's arrest. Orick

---

[1](holding that totality of the circumstances gave experienced police officer reasonable, articulable suspicion for investigative stop, including officer's observation of defendant in company of known drug trafficker in area known for drug transactions, engaged in activity believed to be drug transaction in progress, namely drug trafficker leaning into defendant's car window, with both arms in the car, and dispersal of individuals upon arrival of marked cruiser).

[2](holding that experienced police officer had a reasonable, articulable suspicion that occupants of vehicle driven by defendant were purchasing drugs where "'several hand ins and hand outs'" were observed in an area known for drug transactions).

stated that it is "common place" to find weapons in the course of investigating drug activity. Orick described Robinson as a "known drug dealer that I've arrested on two other occasions, have chased on foot numerous times and also recently recovered a hand gun off this individual."

{¶ 11} Orick described the pouch at trial as a "spider web type mesh," with "an octagonal pattern of the holes." Orick stated that he did not see the pouch when he initially opened the door because when Twinam "was sitting in the seat his legs were blocking any view of that area so I was unable to even know" that the pouch was there. Orick identified the brass knuckles retrieved from Twinam's vehicle, and he stated that they are used "to protect the knuckles and add more force to a punch." Orick stated that he has never known brass knuckles to be used as anything other than a weapon. Orick stated that Twinam told him, after being advised of his rights, that he "uses them for protection especially when he comes to Dayton to purchase heroin."

{¶ 12} On cross-examination, Orick stated that "anything in [the pouch] would be partially obscured by the pouch, but the pouch itself was not concealed." According to Orick, "it wasn't a clear pouch. I could ascertain what was inside the pouch, however, if any item inside that pouch would have been black then no you wouldn't have been able to see it due to the fact this was a shiny gold, I was able to see them through the pouch."

{¶ 13} Following trial, at the court's request, both parties submitted post-trial memoranda addressed to the issue of whether or not the brass knuckles were concealed. In its December 30, 2011 "Final Decision and Entry" the trial court concluded as follows:

* * *

Based on the testimony it is undisputed that on July 11, 2011, Colby

Twinam was arrested for CCW, after he was removed from his vehicle and detained on the ground by Officer Mark Orrick. While outside of the vehicle Officer Orick saw attached to the lower portion of the front driver's seat a mesh pouch. Officer Orick testified that he first recognized the object as brass knuckles while he was holding the Defendant on the ground outside of the vehicle. When questioned, Colby Twinam stated that he obtained the brass knuckles for protection.

The Committee Comments to R.C. 2923.11 provide that a deadly weapon is defined as "any device capable of causing death, and which is either designed or specially adapted for use as a weapon such as a gun, knife, billy or brass knuckles), or is carried, possessed, or used as a weapon (such as a rock or cane when used for offensive purposes)." Brass knuckles are considered a deadly weapon. Twinam admitted knowledge of the weapon in the vehicle. The only issue is whether or not the brass knuckles were concealed. The ["]weapon is concealed if it is so situated as not to be discernible by ordinary observation by those near enough to see it if it were not concealed, who would come into contact with the possessor in the usual associations of life; but that absolute invisibility is not required." *State v. Pettit* (1969), 20 Ohio App.2d 1170, 173-174, 252 N.E.2d 325. Applying this test for concealment to the testimony in this case, one can only conclude that the brass knuckles were concealed. The State has proved beyond a reasonable doubt, the essential elements of the offense of Carrying a Concealed Weapon.

{¶ 14} Twinam asserts two assignments of error herein. His first assigned error, with subparts, is as follows:

"THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO SUPPRESS."

"A. THE OFFICER DID NOT HAVE PROBABLE CAUSE OR REASONABLE SUSPICION TO ENTER THE APPELLANT'S VEHICLE."

"B. THE OFFICER'S OBSERVATIONS DID NOT AMOUNT TO REASONABLE SUSPICION THAT APPELLANT HAD ENGAGED IN CRIMINAL ACTIVITY, THUS, STOP, SEIZURE AND ARREST OF APPELLANT WAS UNLAWFUL."

"C. NO PROBABLE CAUSE EXISTED TO ARREST APPELLANT BEFORE HE OR THE VEHICLE WERE SEARCHED."

{¶ 15} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) . At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence."

*State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

**{¶ 16}** As this Court has previously noted:

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable and articulable suspicion that the person is engaged in criminal activity. * * * . This is so even if the officers lack probable cause to make an arrest. * * * "Reasonable suspicion entails some minimal level of objective justification for making a stop - that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." * * *

We determine the existence of "reasonable and articulable suspicion" by evaluating the totality of the circumstances, considering those circumstances " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " * * * An investigatory detention occurs when, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or was compelled to respond to questions. * * * . *State v. Chadwell*,182 Ohio App.3d 256, 2009-Ohio-1630, 912 N.E.2d 618, ¶ 21-22 (2d Dist.)

**{¶ 17}** In *State v. Maldonado*, 2d Dist. Montgomery No. 13530, 1993 WL 402772 (Sept.

24, 1993), this Court noted as follows:

> Since the decision of the Supreme Court in *State v. Bobo* (1988), [37] Ohio St. 3d [1]77, police officers have more frequently cited the reputation of a vicinity as a "high crime area" when articulating their reasons for a *Terry* stop performed there. This may reflect the greater law enforcement focus on the street-level drug crime, which is usually subtle in its methods and often violent in its consequences.
>
> However, those idiosyncracies do not diminish the requirements of the Fourth Amendment or its interpretation in *Terry*. The facts and circumstances before the officer must yet reasonably suggest that some specific criminal misconduct is afoot. That specificity requirement focuses on the criminal character of the act, not on its setting. Acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area. Acts that are not specifically criminal in character do not become criminal because they are inapposite to their setting and, therefore, "suspicious." The setting can inform the officer's judgment, but it does not make the act criminal. In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer.

{¶ 18} We note that "'[u]nprovoked flight upon seeing police officers is a relevant consideration in determining whether the totality of the facts and circumstances are sufficiently suspicious to justify a *Terry* stop.'" *Chadwell*, ¶ 26. "While such [behavior] is not necessarily indicative of criminal behavior, and can be consistent with innocent conduct, *Terry* recognized

that officers may briefly detain individuals to resolve ambiguity in their conduct." *Id*.

{¶ 19} "'Probable cause to arrest depends 'upon whether, at the moment the arrest was made * * * the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, ¶ 15 (2d Dist.).

{¶ 20} As did the trial court, we conclude that Orick, pursuant to *Terry*, possessed a reasonable, articulable suspicion that Twinam was engaged in criminal activity, as well as probable cause for his arrest upon investigation. Orick observed Twinam's heavily tinted vehicle in the driveway of a vacant home in an area where Orick has made numerous arrests, including an arrest for a hand-to-hand drug transaction in the same driveway three weeks prior to the instant offense. Orick's experience includes 500 - 700 drug-related arrests. Orick observed Robinson, whom he has previously both pursued and arrested for drug-related activity, reaching into Twinam's vehicle in a manner consistent with a hand-to-hand drug transaction. Upon observing Orick, Robinson immediately fled, and Orick observed U.S. currency in his hand. *See Johnson,* fn. 1, and *Abrams*, fn. 2, herein.

{¶ 21} As the officers approached Twinam's vehicle, Twinam refused to comply with Orick's commands to place the vehicle in park and lower the window, and Orick observed him leaning to the right and forward in a manner that suggested the possible presence of weapon, a common feature of street-level drug activity. *See, Maldonado.* After Twinam was removed from the vehicle for officer safety, Orick observed gel caps that he knew from experience are often used to transport drugs, and he observed brass knuckles in a mesh pouch "affixed" to the

front of the seat. At that point, the facts and circumstances within Orick's knowledge were sufficient to warrant Orick's conclusion that Twinam was carrying a concealed weapon. After Orick read Twinam his rights, Twinam admitted that he purchased the brass knuckles at a flea market.

{¶ 22} Since the officers had a reasonable, articulable suspicion, pursuant to *Terry*, that Twinam was engaged in drug-related criminal activity, the stop of his vehicle and Twinam's detention were proper. Since, in the course of his investigation, Orick observed the brass knuckles in the mesh pouch "affixed" to the front of the driver's seat, there was probable cause for arrest for carrying a concealed weapon. Accordingly, Twinam's first assigned error is overruled.

{¶ 23} Twinam's second assigned error is as follows:

"THE DECISION OF THE TRIAL COURT, FINDING APPELLANT GUILTY OF CARRYING A CONCEALED WEAPON, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 24} Twinam asserts that the brass knuckles were not concealed within the meaning of R.C. 2923.12.

{¶ 25} As this Court has previously noted:

When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered." * * * A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." * * * *State v. Hammock*, 2d Dist. Montgomery No. 24664, 2012-Ohio-419, ¶ 12.

**{¶ 26}** We note that in the body of this assigned error, Twinam also asserts that his conviction is not supported by sufficient evidence. Our analysis is different when reviewing a challenge to the sufficiency of the evidence. As this Court noted in *Hammock, ¶* 11:

When a defendant challenges the sufficiency of the evidence, the

defendant is arguing that the State presented inadequate evidence on an element of

the offense to sustain the verdict as a matter of law. * * * "An appellate court's

function when reviewing the sufficiency of the evidence to support a criminal

conviction is to examine the evidence admitted at trial to determine whether such

evidence, if believed, would convince the average mind of the defendant's guilt

beyond a reasonable doubt. The relevant inquiry is whether, after viewing the

evidence in a light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable

doubt." * * *.

**{¶ 27}** R.C. 2923.12 provides: "(A) No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following: (1) A deadly weapon other than a handgun." R.C. 2923.11 defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 28} As this Court has previously noted, the "test for concealment, as it pertains to R.C. 2923.12(A), was set forth in *State v. Petit* (1969), 20 Ohio App.2d 170, 173-174, 252 N.E.2d 325." *State v. Bailey*, 2d Dist. Greene No. 97CA128, 1998 WL 892276 (Aug. 21, 1998). The test is as follows: "A weapon is concealed if it is so situated as not to be discernible by ordinary observation by those near enough to see it were it not concealed, who would come into contact with the possessor in the usual associations of life; but that absolute invisibility is not required." *Bailey*, *id.* "[T]he evident purpose of R.C. 2923.12(A) is to ensure that anyone who comes into contact with a person who is armed with a deadly weapon will be aware of the fact that they are so armed. Thus aware, the individual can act with a heightened degree of prudence." *State v. Curry*, 2d Dist. Montgomery No. 15705, 1996 WL 665009, * 2 (Nov. 15, 1996). In other words, if "the weapon is so situated as not to be discernible by ordinary observation by a person coming into close enough proximity to the bearer of the weapon to interact with the bearer in any meaningful way, then the weapon is concealed for purposes of the statute." *Id.*

{¶ 29} In *Bailey,* this court affirmed the defendant's conviction for carrying a concealed weapon where the police officer, upon opening a vehicle in the course of a traffic stop, "saw part of a gun on the floor near Bailey's feet." This court concluded, "the weapon had not been visible by ordinary observation and had become discernible only after [the officer] had opened the door and looked around the front area of the vehicle." *Id*., * 3.

{¶ 30} Herein, while Orick's testimony at trial was clear that the brass knuckles were clearly visible within the pouch, Orick did not observe the pouch or the brass knuckles, and he was unaware of their existence, until he opened the door and removed Twinam from the vehicle, since the pouch and the brass knuckles within it were obscured by Twinam's legs. In other

words, while the brass knuckles were ready at hand, they were not discernible by ordinary observation by anyone coming into close proximity of Twinam in the usual associations of life; it was Twinam's forced removal from the vehicle that revealed the brass knuckles.

{¶ 31}   Since Twinam's conviction is not against the manifest weight of the evidence and is supported by sufficient evidence, his second assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Troy B. Daniels
Amy B. Musto
Christopher A. Deal
Hon. Deirdre E. Logan